IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

RONALD FAY SCHERMERHORN JR.,      §
                                  §
            Petitioner,           §
                                  §
v.                                §      No. 4:17-CV-559-Y
                                  §
LORIE DAVIS, Director,            §
Texas Department of Criminal      §
Justice, Correctional             §
Institutions Division,            §
                                  §
            Respondent.           §


## OPINION AND ORDER

Before the Court is a petition for a writ of habeas corpus
pursuant to 28 U.S.C. § 2254 filed by petitioner Ronald Fay
Schermerhorn, a state prisoner, against Lorie Davis, director of
the Texas Department of Criminal Justice, Correctional Institutions
Division, Respondent. After having considered the pleadings and
relief sought by Petitioner, the Court has concluded that the
petition should be denied.

## I.  FACTUAL AND PROCEDURAL HISTORY

Petitioner was indicted in Criminal District Court Number
Four, Tarrant County, Texas, in Case No. 1323955R, for continuous
sexual abuse of Q.S., a child younger than 14 years of age.
(Clerk's R. 6, doc. 30-5.) On July 9, 2013, a jury found him guilty
of the offense and, on July 10, assessed his punishment at life
imprisonment. (Id. 78, 84, doc. 30-5.) Petitioner appealed his

conviction, but the Eighth District Court of Appeals of Texas affirmed the trial court's judgment, the Texas Court of Criminal Appeals refused his petition for discretionary review, and the United States Supreme Court denied certiorari. (Electronic R., doc. 30-1.) Petitioner also filed a postconviction state habeas-corpus application challenging his conviction, which was denied by the Texas Court of Criminal Appeals without written order on the findings of the trial court. (WR-86,330-01 Clerk's R. 2-17, doc. 30-23; Action Taken, doc. 30-17.)

The testimony at trial reflects that Petitioner and his family befriended Q.S.'s family while camping. Thereafter, Q.S. and her brother often spent nights with Petitioner's grandchildren at his camper and his home. Petitioner began to engage in sexual activity with Q.S. in 2006 when she was 9 years old and the abuse continued until she was 12 or 13.

## II. ISSUES

Petitioner raises the following five grounds for relief:

(1) his conviction constitutes an ex-post-facto application of the state's continuous-sexual-assault statute;

(2) improper pleading in the indictment and the jury charge violates due process;

(3) he is actually innocent;

(4) he received ineffective assistance of appellate counsel; and

(5) he received ineffective assistance of trial

2

counsel.

(Pet. 6-7, 11-14, doc. 1.) Though Petitioner's grounds are multifaceted, they are addressed as thoroughly as practical below.

### III. RULE 5 STATEMENT

Respondent believes that Petitioner failed to exhaust his state-court remedies as to one or more of his claims but does not otherwise assert that the petition is untimely or successive. (Resp't's Answer 4-5, doc. 32.) Notwithstanding a petitioner's failure to exhaust his state-court remedies as to a claim(s), a court may deny a petition on the merits. 28 U.S.C. § 2254(b)(2).

### IV. STANDARD OF REVIEW

A § 2254 habeas petition is governed by the heightened standard of review provided for by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). See 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. *Id.* § 2254(d)(1)–(2); *Harrington v. Richter,* 562 U.S. 86, 100-01 (2011). This standard is difficult to meet but "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Richter*, 562 U.S. at 102.

Additionally, the AEDPA requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. Further, when the Texas Court of Criminal Appeals denies relief in a state habeas-corpus application without written order, it is "presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter,* 562 U.S. at 99. In such a situation, a federal court may assume the state court applied correct standards of federal law to the facts, unless there is evidence that an incorrect standard was applied. *Townsend v. Sain,* 372 U.S. 293, 314 (1963)[1]; *Catalan v. Cockrell,* 315 F.3d 491, 493 n.3 (5th Cir. 2002); *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001); *Goodwin v. Johnson,* 132 F.3d 162, 183 (5th Cir. 1997). A petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003); *Williams v. Taylor,* 529 U.S. 362, 399 (2000).

In this case, the state habeas court entered findings of fact and conclusions of law relevant to the majority of Petitioner's

---

[1] The standards of *Townsend v. Sain* have been incorporated into 28 U.S.C. § 2254(d). *Harris v. Oliver*, 645 F.2d 327, 330 n.2 (5th Cir. 1981).

claims and the Texas Court of Criminal Appeals adopted those findings in denying relief. Petitioner has failed to rebut the presumptive correctness of the state court's factual findings with clear and convincing evidence; thus, this Court applies the presumption of correctness to those findings, including the court's credibility findings, in considering Petitioner's claims. *See Richards v. Quarterman,* 566 F.3d 553, 563-64 (5th Cir. 2009); *Galvan v. Cockrell,* 293 F.3d 760, 764 (5th Cir. 2002).

## V. DISCUSSION

### A. Ex-Post-Facto Violation

Under his first ground, Petitioner claims that the charges are based on a statute enacted after the alleged offense began or was committed, in violation of the Constitution's ex-post-facto prohibition. (Pet. 11, doc. 1; Pet'r's Mem. 1-5, doc. 21.) Texas's continuous-sexual-abuse statute was effective on September 1, 2007. *See* Act of May 17, 2007, 80th Leg., R.S., ch. 593, § 1.17, 2007 Tex. Gen. Laws 1122, 1129. The indictment alleged offense dates of on or about September 15, 2007, to August 31, 2010. (WR-86,330-01 Clerk's R. 347, doc. 30-24.)

A state is prohibited from enacting an ex-post-facto law. U.S. CONST., art. I, § 10. "The critical question [for an ex-post-facto violation] is whether the law changes the legal consequences of acts completed before its effective date." *Carmell v. Texas,* 529

5

U.S. 513, 520 (2000) (quoting *Weaver v. Graham,* 450 U.S. 24, 31 (1981)). The Ex-Post-Facto Clause prohibits any law that: (1) makes an act done before the passing of the law, which was innocent when done, criminal; (2) aggravates a crime and makes it greater than it was when it was committed; (3) changes the punishment and inflicts a greater punishment for the crime than when it was committed; or (4) alters the legal rules of evidence and requires less or different testimony to convict the defendant than was required at the time the crime was committed. *Carmell,* 529 U.S. at 522.

Relying on *Carmell,* the state habeas court concluded that because the alleged offenses occurred after the effective date of the statute, Petitioner failed to prove an ex-post-facto violation. (Id. at 357.) The state court's decision is a reasonable application of *Carmell*. Petitioner's sexual abuse of Q.S. continued through at least August 31, 2010, well after the effective date of the statute, and he was neither charged nor convicted of any acts of abuse that were innocent when committed. Thus, application of the continuous-sexual-abuse statute to Petitioner's conduct does not implicate the Ex Post Facto Clause.

**B. Due-Process Violation**

Under his second ground, Petitioner claims that his right to due process was violated because of "improper pleading" in the indictment and the court's charge. (Pet. 6, doc. 1.) Specifically, he asserts that the indictment failed to give him fair notice of

the charges against him because it was confusing and unclear by "intermix[ing] charges and elements" in one count and that he was arraigned and pleaded "not guilty" to the offense of aggravated sexual assault of a child, not continuous sexual abuse of a child. (Id. at 11.) As determined by the state court, the latter claim is refuted by the record. (Reporter's R., vol. 2, 4-5, doc. 30-7 & vol. 3, 9-10, doc. 30-8.)

As a matter of federal constitutional due process, a criminal defendant is entitled to notice of the charges against him so that he can prepare a trial defense. *See Ables v. Scott,* 73 F.3d 591, 593-04 (5th Cir. 1996) (citing *Cole v. Arkansas,* 333 U.S. 196, 201 (1948)); *McKay v. Collins,* 12 F.3d 66, 69 (5th Cir. 1994). Under § 21.02 of the Texas Penal Code, a person commits an offense, then and now, if "during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse" and "at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is a child younger than 14 years of age." TEX. PENAL CODE ANN. § 21.02(b)(1)-(2) (West Supp. 2014). An "act of sexual abuse" is defined, among other things, as any act of indecency with a child or aggravated sexual assault of a child under penal code §§ 21.11(a)(1) and 22.021. *Id.* § 21.02(c)(2), (4).

Petitioner's indictment alleged that on or about September 15, 2007, through August 31, 2010, he—

did intentionally or knowingly during a period of time
that is 30 days or more in duration, commit two or more
acts of sexual abuse, to wit: aggravated sexual assault
of a child under 14, by causing the sexual organ of
[Petitioner] to contact the sexual organ of Q.S., and/or
by causing the penetration of the sexual organ of Q.S. by
inserting his finger into her sexual organ, and/or by
causing the sexual organ of Q.S. to contact the mouth of
[Petitioner], and/or indecency with a child by causing
Q.S. to contact the genitals of [Petitioner], and/or by
[Petitioner] touching the genitalis of Q.S. . . .

(WR-86,330-01 Clerk's R. 371, doc. 30-24.)

Although the state habeas court did not specifically address Petitioner's due-process claim, the indictment gave Petitioner constitutionally adequate notice of the charges against him. State law is clear that an indictment may allege different manners or means of committing a single offense in the same paragraph. *See Marinos v. State,* 186 S.W.3d 167, 175 (Tex. App.-Austin 2006, pet. ref'd). In charging an offense for continuous sexual abuse of a child, the state is not required to allege the specific manner and means by which the defendant allegedly committed the predicate offenses or the specific number and dates of the sexual acts to provide adequate notice. *See Jacobsen v. State,* 325 S.W.3d 733, 738 (Tex. App.-Austin 2010). The indictment here tracks the applicable statutory language by alleging each element of the offense of continuous sexual abuse of a child. The indictment also alleges the different means by which Petitioner was alleged to have committed the offense of continuous sexual abuse of a child by listing the specific acts of sexual abuse allegedly committed by him, and the

acts listed constitute an "act of sexual abuse" under the statute. Further, the indictment alleged a time of commission after the effective date of the continuous-sexual-abuse statute.

Petitioner also claims that his right to due process was violated because the jury charge did not require jury unanimity on which specific acts of sexual abuse were committed by Petitioner or the exact date when those acts were committed. (Pet'r's Mem. 6-9, doc. 21.) He also complains of the inclusion of instructions on the separate offenses of aggravated sexual assault of a child and indecency with a child as alternatives to an acquittal. (Pet. Mem. 6-9, doc. 21.)

Improper jury instructions in state criminal trials generally do not provide a basis for federal habeas-corpus relief. *See Estelle v. McGuire,* 502 U.S. 62, 71-72 (1991)(stating that federal habeas courts do not grant relief solely on the basis that a jury charge was erroneous). An improper instruction violates due process only if the petitioner demonstrates that the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637-38 (1993).

The continuous-sexual-abuse statute expressly provides that "[i]f a jury is the trier of fact, members of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed." TEX. PENAL CODE ANN. § 21.02(d) (West Supp.

2014). Nor was it improper for the jury to be instructed on the predicate offenses of aggravated sexual assault of a child and indecency with a child. Both offenses are specifically enumerated under § 21.02(c) and are lesser-included offenses of the offense of continuous sexual abuse. *See Price v. State,* 434 S.W.3d 601, 606 (Tex. Crim. App. 2014). Thus, the jury instructions were proper as a matter of state law, and Petitioner presents no persuasive argument that, even if wrong, the instructions had a substantial and injurious effect or influence on the jury's verdict.

### C. Actual Innocence

Under his third ground, Petitioner claims that he is actually innocent of the offense. (Pet. 7, 12, doc. 1.) "Actual innocence" is not an independent ground for habeas-corpus relief. *Herrera v. Collins,* 506 U.S. 390, 400 (1993); *Foster v. Quarterman,* 466 F.3d 359, 367 (5th Cir. 2006); *Dowthitt v. Johnson,* 230 F.3d 733, 741–42 (5th Cir. 2000). The United States Supreme Court reaffirmed in *McQuiggin v. Perkins,* 569 U.S. 383, 392 (2013), that it has not resolved whether a prisoner may be entitled to habeas-corpus relief based on a freestanding claim of actual innocence. Until it does, such a claim is not cognizable on federal habeas review. Moreover, to establish actual innocence, a petitioner "must support his allegations with new, reliable evidence that was not presented at trial and show that it was 'more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'"

*Fairman v. Anderson,* 188 F.3d 635, 664 (5th Cir. 1999) (quoting *Schlup v. Delo,* 513 U.S. 298, 327 (1995)); accord *Finley v. Johnson,* 243 F.3d 215, 221 (5th Cir. 2001). Petitioner merely asserts a lack of evidence as the basis for this claim and offers no new, reliable evidence sufficient to refute the jury's verdict.

### D. Ineffective Assistance of Counsel

Under his fourth and fifth grounds, Petitioner claims that he received ineffective assistance of trial and appellate counsel. A criminal defendant has a constitutional right to the effective assistance of counsel at trial and on the first appeal as of right. U.S. Const. amend. VI, XIV; *Evitts v. Lucey,* 469 U.S. 387, 396 (1985); *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To establish ineffective assistance of counsel a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697.

In applying this test, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial or appellate strategy. *Id*. at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be

made to eliminate the distorting effects of hindsight. *Id.* at 689. Where a petitioner's ineffective-assistance claims have been reviewed on their merits and denied by the state courts, federal habeas relief will be granted only if the state courts' decision was contrary to or involved an unreasonable application of the *Strickland* standard in light of the state-court record. *Richter,* 562 U.S. at 100-01 (quoting *Williams v. Taylor,* 529 U.S. 362, 410 (2000)); *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). Thus, a federal court's review of state-court decisions regarding ineffective assistance of counsel must be "doubly deferential" so as to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow,* 134 S. Ct. 10, 13 (2013) (quoting *Cullen v. Pinholster,* 563 U.S. 170, 190 (2011)).

Under his fifth ground, Petitioner claims his trial counsel were ineffective by failing to—

(1)  object to the indictment;
(2)  object to the court's charge;
(3)  object to the state's closing argument bolstering its own witnesses' credibility;
(4)  object to hearsay testimony from the state's medical expert;
(5)  interview and investigate witnesses;
(6)  investigate the case as a whole;
(7)  put forth any defense or defensive theory;
(8)  cross-examine all of the state's witnesses;
(9)  present defense witnesses during the guilt/ innocence phase;
(10) allow Petitioner to testify;
(11) impeach the state's medical expert;
(12) obtain a medical expert for the defense; and
(13) file a motion for new trial during trial due to errors of the trial court.

(Pet. 7, 14, doc. 1.)

The state habeas court conducted a hearing by affidavit, and lead counsel Terry John Barlow, an experienced and board-certified criminal-defense attorney, responded to the allegations as follows (all spelling, grammatical, and/or punctuation errors are in the original):

[I]n May of 2011 [Petitioner] had employed the firm to represent him in connection with accusations of sexual assaults on children and I was assigned to the cases as lead counsel. Although initially there were two cases, over time two additional cases were filed against [Petitioner], raising the total to four, and each with a separate alleged child victim. The cases were as follows:

Cause Number 1243959-Indecency Fondling;

Cause Number 1249555-Sexual Abuse of a Child Under 14-Continuous;

(NOTE: This case was later re-indicted as Cause Number 1323955)

Cause Number 1280534-Indecency Fondling;

Cause Number 1280537-Indecency Fondling;

Cause Number 1323955-Sexual Abuse of a Child Under 14-Continuous;

(NOTE: A re-indictment of Cause Number 1249555. This was the case that would eventually be brought to jury trial)

From June 2011 through July 2013 I attended a total of 21 court settings with my client. At these settings [Petitioner] was invariably accompanied by his wife Candy Schermerhorn, who was heavily involved with the cases. At these settings I would discuss the cases with the assigned prosecutors and after we were excused by the court would spend from several minutes to a half-hour or more discussing the day's events with the Schermerhorns. In addition I spoke with them personally over the phone

13

over 21 times and met with them at the office at least 5 times for lengthy sessions. I also had separate meetings outside of the court settings with the prosecutors on at least 3 occasions. During this time we had also obtained full discovery from the District Attorney's office, including offense reports, witness statements, medical records, and so forth, and had discussed the contents of these at the meetings with the Schermerhorns.

After review of the discovery and following consultation with [Petitioner] it became very apparent that the major issue in defending him would be the sheer number of alleged injured parties. [Petitioner] was facing three 2nd degree felony cases for Indecency with a Child and a 25 to life case for Continuous Sexual Abuse of a Child, with potential stacking implications depending on how the State chose to proceed. Another major issue was that even if the State chose to try one case at a time (which again would raise the reasonable probability that the judge might stack any sentences), we would have to be extremely careful at trial not to open the door to any extraneous offenses including those pending trial.

To summarize in general, the allegations were that over a course of time, [Petitioner] had regular and routine contact with all the alleged injured parties. These contacts consisted of allowing them either individually or severally into his home on a frequent basis providing them with food and sweets, taking them on trips, buying them expensive gifts, and engaging with them on a variety of occasions. Most significantly, the vast majority of these encounters occurred with either no other adult present, or less frequently with his wife present but asleep or leaving to run errands. One particular allegation of note was that [Petitioner] engaged in a "hot-tub party" with several of the victims. The sexual assaults were alleged to have occurred during these activities.

When questioned about these circumstances, [Petitioner] never denied the multiple encounters and events mentioned above, but only denied committing the sexual assaults alleged. In other words there were multiple times and places where the sexual assaults could have occurred, but they were so frequent and numerous that it would be difficult to find time and place discrepancies in the victim's stories. In addition [Petitioner]'s activities would certainly be characterized by the prosecution as

grooming, even more so since some of the activities (such as the hot-tub party) were at best questionable decisions. Finally, [Petitioner] could never explain why 4 children for whom he had done nothing but good things would suddenly turn on him and all 4 make various allegations of sexual abuse.

After a thorough review of all the evidence and after several consultations with [Petitioner] I strongly recommended that he allow me to seek a plea bargain. The initial offer from the state in October 2011 was 30 years on the Continuous case with plea bargains on the Indecency cases to run concurrent. This offer was rejected by [Petitioner], who authorized me to seek a probation plea offer. The State had strongly indicated to me that they would never be offering a probated sentence, but in September 2012 I was able to negotiate a 16 year sentence wherein the State would dismiss the Continuous case and allow the client to plead guilty to the Indecency cases. In a meeting with [Petitioner] I indicated to him that I had the reasonable belief that I could talk the State into a something in the 12-to-15 year range if he agreed to allow me to seek it. I told him again and again that a likely outcome of a trial on the Continuous case would be a life sentence and begged him to strongly consider something in the 12-to-15 year range. He refused, however, and eventually the offer was withdrawn. [Petitioner] stated to me that the reason for his rejection was that any pen-time offer was a "death sentence" for him, and there was nothing I could do to persuade him to take any sort of offer which would result in pen time.

During final pre-trial preparations [Petitioner] was adamant that he did not want to testify, and I was in agreement with this, as I felt that, due to his appearance, demeanor, and lack of any sort of reasonable explanation for his overall conduct, he would make a poor witness. I was also very concerned that if he did testify he would very likely open the door to the other extraneous offenses. I did thoroughly advise him of his rights in that regard, and that it was his decision, but he never indicated any desire to testify, either then or at any time during the trial.

Part of the pre-trial preparations included discussing potential witnesses for the defense. Candy Schermerhorn was a potential witness, but the issue with her was that

if she testified it would only serve to confirm the multiple opportunities [Petitioner] was alone with the alleged victims and the circumstances of what the prosecution would characterize as grooming. In addition she was not particularly keen about testifying, and again I was in agreement with this, in part due to her appearance and demeanor but also because other than to deny that she ever saw an offense committed she would per force have to confirm virtually every circumstance of the prosecution's case. The potential testimony of [Petitioner]'s grandson Micah was also discussed, but it was ultimately decided that putting a child on to say that he never saw the sexual assaults of other children was not in either [Petitioner]'s nor Micah's best interest. We did discuss punishment witnesses and of course these were prepared and eventually called at trial.

In his writ [Petitioner] makes numerous claims, many of which are directly contradicted by the record. For example, he complains that he never pled "Not Guilty" to the charge of Continuous Sexual Abuse when in fact he did. He states that the charge mentions extraneous offenses when it is actually a standard extraneous offense instruction. He further claims that objections were not made during closing argument when indeed several were made and one was the subject of the appeal filed by his appellate counsel.

[Petitioner] goes on to claim ineffectiveness of counsel due to the lack of cross examination of Detective Martinez. While true, the reason for it was that Detective Martinez' testimony as given did not hurt [Petitioner]'s case. Throughout the discovery process it was learned that Detective Martinez did have potentially damaging information that he did not testify about at trial, so a prudent strategy was to simply not open the door through cross examination.

[Petitioner] also complains of the lack of a defense medical expert and about the cross examination of Araceli Desmarais [the sexual assault nurse examiner]. The idea of employing a medical expert was discussed pre-trial in detail, particularly since there were virtually no physical findings consistent with sexual assault. It was decided by the Schermerhorns that the expense of employing a defense medical expert to review prosecution evidence that was arguably favorable to the defense was

not necessary. Ms. Desmarais did testify regarding
hearsay given by the alleged victim during the course of
medical treatment, but this was of course admissible.
Finally, on cross examination Ms. Desmarais did concede
that someone who had been sexually assaulted hundreds of
times would likely have some physical findings.

In summary, the defense was the best that could be done
under difficult circumstances. The defense was hamstrung
due to the number of alleged victims, the undisputed
circumstances of [Petitioner]'s relationship with the
victims, and [Petitioner]'s inability to articulate a
reason for the victims to have fabricated the
allegations. [Petitioner] received effective assistance
of counsel.

(WR-86,330-01 Clerk's R. 337-40, doc. 30-24.)

Barlow's co-counsel also provided an affidavit, in which he

states (all spelling, grammatical, and/or punctuation errors are in

the original):

Mr. Barlow was the primary attorney who handled all trial
preparation and investigations.

Prior to trial, as part of my responsibilities and duties
. . ., I had met [Petitioner] when I reset the case for
Terry Barlow. I recall only appearing for [Petitioner]
once or twice prior to trial, I believe, mainly because
Mr. Barlow was out sick. During these brief interactions
at court, I only discussed the docket process with
[Petitioner]- nothing about his case. I was never
involved in the trial strategy decisions or
conversations.

Once the trail date came, I asked Mr. Barlow if I could
sit second chair for the experience. My responsibilities
were to keep up with the exhibits, attend to [Petitioner]
during trial, filter notes between he and Mr. Barlow, and
take the defense punishment witnesses on direct
examination- if it got to that point.

During the trial, I was privy to several conversations
between [Petitioner] and Mr. Barlow. Prior to voir dire,
I overheard Mr. Barlow remind [Petitioner] of the range
of punishment, explain [Petitioner]'s alleged extraneous

offenses, and discuss [Petitioner] taking the stand and testifying. Mr. Barlow advised again, once the state rested, that it would not be wise for [Petitioner] to take the stand because, once he did, the defense would be opening the door to all the extraneous offenses coming in before the jury for purposes of guilt/innocence. Mr. Barlow left that decision to [Petitioner] who opted to exercise his 5th Amendment right and not testify.

It was determined that [Petitioner]'s best chance/ strategy to avoid a life sentence was to not . . . cross examine and "beat up" on the punishment witnesses provided by the state, but rather put on the witnesses [Petitioner] had brought for punishment to tell the jury their experiences with him and how much they loved him. We tried to humanize him in hopes the jury would not give the life sentence. We also feared that if [Petitioner] took the stand during the punishment phase, once the State was able to cross-examine him, it would not go well. Mr. Barlow again discussed this with [Petitioner] and again [Petitioner] decided not to take the stand.

Throughout the trial, I talked with the witnesses [Petitioner] had wanted for punishment. I talked to one of his daughters and some friends of his who had been there for support. We discussed their loving experiences with [Petitioner], what things made him a good person, and that they loved him very much. They testified to the same in front of the jury.

All that I have mentioned was my experience with [Petitioner]'s case. I do believe we, and Mr. Barlow in particular, put on a great defense for [Petitioner] while avoiding opening the door to the extraneous offenses during trial. I also believe that [Petitioner] made a conscious decision not to testify in both the guilty/ innocence and punishment phases of trial.

(Id. at 342-43.)

Based on counsel's affidavits and the documentary record, the state habeas court entered factual findings, too numerous to list here, refuting Petitioner's claims. (Id. at 348-54.) Based on those findings, and applying the *Strickland* standard and relevant state

law, the state court entered the following legal conclusions:

24. Counsel properly did not object to the indictment.

25. Counsel properly did not object to the court's charge.

26. Counsel properly objected to the State's closing argument.

27. Counsel properly did not object to the standard extraneous offense instruction in the court's charge.

28. Counsel properly interviewed witnesses.

29. Counsel properly investigated witnesses.

30. Counsel's decision to not have [Petitioner]'s wife testify was the result of reasonable trial strategy.

31. Counsel's decision to not put [Petitioner] on the stand after [Petitioner] decided not to testify was the result of reasonable trial strategy.

32. Counsel's decision to not have [Petitioner]'s grandson testify was the result of reasonable trial strategy.

33. Counsel's choice of defense was the result of reasonable trial strategy.

34. Counsel's decision to not cross-examine Detective Martinez was the result of reasonable trial strategy.

35. Counsel's choice of witnesses was the result of reasonable trial strategy.

36. Counsel's decision to not hire a medical expert was the result of reasonable trial strategy.

37. Counsel's cross-examination of Ms. Desmaris was the result of reasonable trial strategy.

38. The following are not excluded by the rule against hearsay, regardless of whether the declarant is

available as a witness:

(4) Statement Made for Medical Diagnosis or Treatment. A statement that:

(A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and

(B) describes medical history; past or present symptoms or sensations; their inception; or their general cause.

39. Counsel's decision to not object to Ms. Desmaris' hearsay testimony because it was admissible as statements made during medical diagnosis was the result of reasonable trial strategy.

40. [Petitioner] has failed to prove that his attorneys' representation fell below an objective standard of reasonableness.

. . .

43. [Petitioner] has failed to show that there is a reasonable probability that the result of the proceeding would have been different had counsel objected more.

44. [Petitioner] has failed to show that there is a reasonable probability that The result of the proceeding would have been different had counsel conducted more investigation.

45. [Petitioner] has failed to show that there is a reasonable probability that the result of the proceeding would have been different had counsel interviewed more witnesses.

46. [Petitioner] has failed to show that there is a reasonable probability that the result of the proceeding would have been different had counsel presented a different defense.

47. [Petitioner] has failed to show that there is a reasonable probability that the result of the proceeding would have been different had counsel cross examined Detective Martinez.

48. [Petitioner] has failed to show that there is a reasonable probability that the result of the proceeding would have been different had counsel hired a medical expert.

49. [Petitioner] has failed to show that there is a reasonable probability that, but for the alleged acts of misconduct, the result of the proceeding would have been different.

50. [Petitioner] has failed to prove that he received ineffective assistance of trial counsel.

(Id. at 358-61 (citations omitted).)

Deferring to the state courts' factual findings, and having independently reviewed Petitioner's claims in conjunction with the state-court record, the state courts' application of *Strickland* was not objectively unreasonable. Petitioner's claims are largely conclusory, with no factual or legal basis, refuted by the record, involve strategic and tactical decisions made by counsel, or would have required counsel to make frivolous or futile motions or objections, all of which generally do not entitle a state petitioner to federal habeas relief. *See Strickland,* 460 U.S. at 689 (strategic decisions by counsel are "virtually unchallengeable" and generally do not provide a basis for post-conviction relief on the grounds of ineffective assistance of counsel); *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) (counsel is not required to make futile motions or frivolous objections); *Evans v. Cockrell,* 285 F.3d 370, 377 (5th Cir. 2002) (a petitioner must "bring forth" evidence, such as affidavits, from uncalled witnesses in support of an ineffective-assistance claim); *Green v. Johnson,*

160 F.3d 1029, 1042 (5th Cir. 1998) ("[m]ere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue"); *United States v. Green,* 882 F.2d 999, 1003 (5th Cir. 1989) ("[a] defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial"); *Alexander v. McCotter,* 775 F.2d 595, 602 (5th Cir. 1985) (ineffective assistance claims "based upon uncalled witnesses [are] not favored because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain, and . . . speculations as to what these witnesses would have testified [to] is too uncertain"). Further, because Petitioner fails to establish separate acts of deficient performance, it necessarily follows that relief is not warranted under a cumulative *Strickland* analysis. (Pet'r's Traverse 10-11, doc. 36.)

Finally, under his fourth ground, Petitioner claims that his appellate counsel was ineffective by failing to—

(1) address the ex-post-facto violation;
(2) timely notify him of the Eighth Court of Appeals' decision;
(3) address the "courts charge, pleadings, and indictment defects";
(4) address the "unbelievable testimony from state's witnesses, contradiction in testimony, sufficiency of evidence and lack of physical evidence that also contradicted testimony";
(5) address the five motions that were filed with the trial court sixteen minutes before trial;
(6) address all other improper rulings and issues; and

(7)   file an adequate brief.

(Pet. 7, 13, doc. 1.)

To the extent raised in Petitioner's state habeas application, appellate counsel Wayne Salvant responded to the allegations, also via affidavit, as follows:

> First, many of [Petitioner]'s claims are baseless. The appeal that was done on behalf of [Petitioner] did raise issues about objections during his trial. The other claims by [Petitioner] are baseless in that there was no legal reason to claim the issues that he has put forward. Appellate counsel did not believe that trial counsel was ineffective. Appellant counsel did inform [Petitioner] of the 8th Court of Appeal[s'] decision in a timely fashion. Appellant [counsel] did not find error in motions filed before trial and finally appellant counsel did prepare and timely filed a brief on behalf of [Petitioner] based upon the records that were provided and it was an adequate brief. Appellant counsel could find no legal issue with the jury charge.
>
> All of the allegations made by [Petitioner] are baseless and without merit.

(WR-86,330-01 Clerk's R. 344, doc. 30-24.)

Based on counsel's affidavit and the documentary record, the state habeas court entered the following factual findings:

92.   [Petitioner] was arraigned on the offense of continuous sexual abuse of a child.

93.   [Petitioner] pled not guilty to continuous sexual abuse of a child.

94.   The jury was instructed on the offense dates of "on or about the 15th day of September 2007, . . . through the 31st day of August 2010."

95.   Hon. Salvant did not attack the jury charge because there was no legal reason to do so.

96.  The indictment alleged offense dates of on or about September 15, 2007, to August 31, 2010.

97.  The effective date of the continuous sexual abuse statute was September 1, 2007.

98.  Hon. Salvant did not make an ex post facto violation claim because there was no legal reason for him to do so.

99.  Hon. Salvant concluded that trial counsel was not ineffective.

100. Hon. Salvant advised [Petitioner] of the 8th Court of Appeals' decision in a timely fashion.

101. Hon. Salvant did not find any errors in the motions filed.

102. Hon. Salvant did not find the motions filed were untimely.

103. The appellate court decided [Petitioner]'s appeal on the merits.

104. There is no evidence that Hon. Salvant's brief was inadequate.

105. Hon. Salvant filed his brief timely.

     . . .

107. There is evidence that Hon. Salvant's representation was the result of reasonable appellate strategy.

108. There is no evidence that a reasonable likelihood exists that the outcome of the appeal would have been different had counsel alleged on direct appeal that [Petitioner] received ineffective assistance of trial counsel.

(Id. at 354-56 (citations omitted).)

     Based on its findings, and applying the *Strickland* standard,

the state court concluded that appellate counsel's choice of issue

and decision not to raise Petitioner's claims on appeal was the result of reasonable appellate strategy. (Id. at 362-63.)

Deferring to the state courts' factual findings, the state courts' application of *Strickland* was not objectively unreasonable. To prevail on a claim of ineffective assistance of counsel on appeal, a petitioner must make a showing that had counsel performed differently, he would have prevailed on appeal. *Sharp v. Puckett,* 930 F.2d 450, 453 (5th Cir. 1991) (citing *Strickland,* 466 U.S. at 687). Appellate counsel is not required to urge every possible argument, regardless of merit. *Smith v. Robbins,* 528 U.S. 259, 288 (2000); *Sharp,* 930 F.2d at 452. It is counsel's duty to choose among potential issues, according to his judgment as to their merits and the tactical approach taken. *Jones v. Barnes,* 463 U.S. 745, 749 (1983). Petitioner fails to raise any meritorious claims in this petition. Prejudice does not result from appellate counsel's failure to assert meritless claims or arguments on appeal. *See United States v. Wilkes,* 20 F.3d 651, 653 (5th Cir. 1994).

### E. Evidentiary Hearing

Petitioner seeks an evidentiary hearing for purposes of further developing the record in support of his claims. (Pet'r's Mem. vii, doc. 21.) *See* 28 U.S.C. § 2254(e)(2); Rules Governing Section 2254 Cases 7. However, review under § 2254(d)(1) is generally limited to the record that was before the state court

that adjudicated a claim(s) on the merits. *Cullen v. Pinholster,* 563 U.S. 170, 181-82 (2011). Further, § 2254(e)(2) provides:

> (e)(2)  If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–
>
>> (A)  the claim relies on–
>>
>>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>>
>>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>>
>> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Id.*

Petitioner has not met the statutory criteria and further development of the record is not necessary in order to assess the claims.

## VI.  Conclusion

For the reasons discussed, the Court DENIES Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Further, Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability is issued under 28 U.S.C. § 2253. A certificate of appealability may

issue "only if the [Petitioner] has made a substantial showing of the denial of a constitutional right." *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003). "Under this standard, when a district court denies habeas relief by rejecting constitutional claims on their merits, 'the petitioner must demonstrate that reasonable jurists would find The district court's assessment of The constitutional claims debatable or wrong.'" *McGowen v. Thaler,* 675 F.3d 482, 498 (5th Cir. 2012) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000)). Petitioner has not made a showing that reasonable jurists would question this Court's resolution of his constitutional claims. Therefore, a certificate of appealability should not issue.

SIGNED August <u>17</u>, 2018.

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE